960 So.2d 122 (2007)
Cherrie LEIGHOW
v.
Kelly M. CRUMP, et al.
No. 2006 CA 0642.
Court of Appeal of Louisiana, First Circuit.
March 23, 2007.
Rehearing Denied May 11, 2007.
*124 A.J. Paul Fredrickson, II, Baton Rouge, for Plaintiff-Appellant Cherrie Leighow.
Henry G. Terhoeve, Baton Rouge, for Defendants-Appellees Kelly Crump and USAA Casualty Insurance Company.
Robert D. Hoover, Baton Rouge, for Intervenor-Appellant Kean's The Cleaner, Inc.
Before: KUHN, GAIDRY, and WELCH, JJ.
GAIDRY, J.
The plaintiff, Cherrie Leighow, and the intervenor, Kean's the Cleaners, Inc. (Kean's), appeal a judgment on a jury verdict in favor of Ms. Leighow, awarding her special damages, but no general damages, as a result of the accident at issue. Ms. Leighow and Kean's also appeal the trial court's denial of their subsequent motions for new trial or judgment notwithstanding the verdict (JNOV). The issues on appeal are whether the jury erred in failing to award any amount for Ms. Leighow's general damages, in light of its awards of special damages, and whether it erred in awarding only a fraction of the medical expenses Ms. Leighow claims as a result of this accident.
After a thorough review of the record and applicable law, we affirm the judgment in part as to the award for medical expenses. We reverse the judgment in part on the issue of general damages, finding an abuse of discretion, and amend the judgment to render an award for this proven element of damages.

THE ACCIDENT
On December 5, 2000, the defendant, Kelly Crump, drove her vehicle (a Suburban sport-utility vehicle) into the drive-through lane at Kean's on Jefferson Highway. Ms. Leighow, a Kean's employee, saw Ms. Crump drive up, retrieved her clothing, and went outside to put it in Ms. Crump's vehicle. As she approached the vehicle, Ms. Crump stepped out of the vehicle and asked Ms. Leighow to wait, as her dogs were in the back seat of the vehicle. Ms. Crump exited the vehicle, but inadvertently failed to put the gear in park. When she lifted her foot off of the brake, the vehicle rolled, knocking Ms. Crump into Ms. Leighow, causing them both to fall to the ground.[1]
Both Ms. Crump and Ms. Leighow were taken by ambulance to Our Lady of the Lake Regional Medical Center (OLOL) for treatment of injuries sustained as a result of the accident. The extent of the injuries suffered by Ms. Leighow lies at the core of the issues presented in this *125 appeal and is addressed in the following discussion.

PROCEDURAL HISTORY
Ms. Leighow filed a petition for damages against Ms. Crump and her insurer, USAA Casualty Insurance Company, as well as her own underinsured motorists insurer, Patterson Insurance Company (Patterson). Patterson subsequently became insolvent and Ms. Leighow amended her petition to add or substitute the Louisiana Insurance Guaranty Association (LIGA) as a defendant. She ultimately settled with and dismissed LIGA from the suit. Kean's and Louisiana United Business Association Self Insured Fund (LUBA) intervened in the suit asserting their subrogation rights workers' compensation benefits and medical expenses paid to or on behalf of Ms. Leighow for her work-related injuries.
At the conclusion of trial, the jury returned a verdict finding Ms. Crump 100% at fault (and finding Ms. Leighow free from fault) in causing the accident. The jury also found that Ms. Crump's fault was the legal cause of Ms. Leighow's injuries and damages.[2] The jury awarded the following damages:

 Past medical and/or dental expenses: $5,500.00
 Past and future pain and suffering: $ 0 
 Past and future mental anguish: $ 0 
 Loss of Enjoyment of Life: $ 0 
 Past lost wages: $5,000.00

A judgment in accordance with the jury verdict was rendered in favor of Ms. Leighow, but also incorporating the intervenors' subrogation claims to the extent of the amount awarded, awarding Kean's and LUBA $10,500.00 together with costs and legal interest. Ms. Leighow filed alternate motions for new trial or JNOV, which were denied by the trial court. This appeal by Ms. Leighow and the intervenor followed.

EVIDENCE OF INJURIES AND TREATMENT
The record provides the following evidence with regard to Ms. Leighow's injuries. It is undisputed that Ms. Leighow fell to the ground, but disputed whether she struck her head on the pavement of the parking area. She was transported by ambulance to the hospital emergency room, where she complained of chest pain, trouble breathing, and pain to her back, neck, and head. At the emergency room, she was examined by Dr. Ronald Coe, who found no physical signs of concussion or loss of consciousness. However, he did make a notation of concussion in her chart, as she claimed to have been confused. She had no dizziness, did not vomit, and had no double vision. She was prescribed Lortab and Advil for pain and released with instructions to return if her symptoms changed or worsened.
According to both Ms. Leighow and her daughter Danielle, once she got home, Ms. Leighow began to experience extreme dizziness, *126 leading to nausea and vomiting. She returned to the emergency room four days later. She was then prescribed Phenergan for the nausea and vomiting and another medication for pain.
Ms. Leighow testified that because of continuing dizziness, nausea, and vomiting, she sought further treatment at Industrial Medical Clinic in mid-December, 2000. She was placed on a different anti-nausea medication and referred to Peak Performance for physical therapy. She testified that she attempted two sessions of physical therapy, but was unable to continue because any head movement immediately exacerbated the dizziness and nausea.
On January 3, 2001, Ms. Leighow consulted Dr. John Clark, a specialist in physical medicine and rehabilitation, complaining of the same symptoms: primarily nausea, vomiting, dizziness, vertigo with ear discomfort, right frontal headache, and also cervical and bilateral shoulder discomfort together with left chest wall pain. Dr. Clark diagnosed vestibular dysfunction, and based on the history he attributed her condition to the accident at issue. Dr. Clark was of the opinion that Ms. Leighow's condition was disabling. He recommended that she be examined by an ENT physician, Dr. James Soileau, who specialized in treatment of that particular condition.
She also consulted Dr. Stanley Peters on February 7, 2001. She presented to him with "inner ear problems" and complaints of vertigo, nausea, blurred vision, headaches, right ear pain, jaw pain, and "roaring" in both ears. He ordered diagnostic testing. Ms. Leighow was unable to successfully complete all of that testing, rendering the results inconclusive. Dr. Peters referred Ms. Leighow to Dr. Soileau, Dr. Zuckerman (a neurologist), and Dr. Fivgas (an ophthalmologist).
Ms. Leighow was seen by Dr. Fivgas, who ruled out any retinal problems. He in turn referred her to Dr. Bradley Black, an ophthalmologist specializing in adult strabismus (a normal degenerative condition often occurring in persons after the age of forty, but which can also be caused by a closed-head injury) and ocular motility disorders. Ms. Leighow saw Dr. Black on February 26, 2001. Dr. Black ordered prescription glasses to help correct her double vision. When he saw Ms. Leighow again in October 2001, he found that she was doing better.
On June 5, 2001, Ms. Leighow finally saw Dr. Soileau, to whom she had been referred earlier by Dr. Clark. Dr. Soileau was an ENT specialist and neuro-otologist with a practice limited to vertigo and complicated hearing and balance problems. He testified that all of her symptoms, with the exception of the double vision and the ear pain, were consistent with vestibular disturbance and the dislodging of the crystals in the ear. He testified that that condition can be caused by "any number of things: trauma . . . sometimes just the bump on the cabinet door, getting in and out of the trunk of your car . . . inner ear disturbances, concussions, changes in ear fluid pressure, viruses." Based on the history of the accident at Kean's and the reported symptoms of immediate dizziness that worsened rapidly, Dr. Soileau expressed the opinion "that in all probability the benign positional vertigo (BPPV) is secondary to the accident." He scheduled Ms. Leighow for particle repositioning to resolve the positional vertigo, which involved moving the "crystalline debris . . . from the canal back into the chamber that it came from and allow[ing] this crystalline debris to restick so that it doesn't keep bouncing around triggering symptoms." Dr. Soileau performed the repositioning treatment to both the right and left ears, and at her follow-up visit on January 2, *127 2002 found her to be doing fairly well. Unfortunately, Ms. Leighow was involved in another automobile accident on January 17, 2002, which caused her symptoms to regress and delayed her recovery.
In rebuttal of Ms. Leighow's evidence, the defendants presented evidence of relevant prior medical history which had not been provided by Ms. Leighow to her treating physicians, summarized as follows:
(1) 1987: Visits to OLOL for complaints of nausea and vomiting;
(2) 1988: An automobile accident prompting Ms. Leighow to be seen in a hospital emergency room with complaints that she was groggy and felt she was "floating"; she also was found to be anxious and had questionable loss of consciousness;
(3) 1992: She was seen by a neurologist for nausea, vomiting, and headaches. She saw this physician for an accident in 1992. She denied that she saw a doctor for nausea;
(4) 1996: She was seen by a physician presenting a history of taking medication for dizziness and complaining of a cervical disc, depression, and TMJ symptoms;
(5) July 1998: She was seen in a hospital emergency room with complaints of nausea and vomiting following another automobile accident;
(6) November 1998: She again went to an emergency room after an accident, complaining of dizziness. She was unsure if she had loss of consciousness. She was ultimately treated by a psychiatrist for posttraumatic stress disorder. She also had panic attacks and could not remember numbers after that accident;
(7) January 1999: Ms. Leighow was seen in an emergency room after another accident, with complaints of nausea, dizziness, blurred vision, and passing out. At the trial of this action, she vehemently denied that prior accident occurred;
(8) February 1999: She was seen by a physician, Dr. Lea, with complaints of blurred vision, dizziness, depression, and anxiety;
(9) February 1999: She was seen at OLOL with complaints of memory loss, depression, and anxiety. She was also treated by a physician, Dr. Bondy, for post-traumatic stress reaction;
(10) Ms. Leighow admitted that prior to the accident at Kean's, she experienced panic attacks, during which her heart would "beat hard" and she would get "dizzy" and "sick to her stomach," and would vomit. She also suffered from migraine headaches.

SPECIAL DAMAGES (MEDICAL EXPENSES)
Ms. Leighow introduced documentary evidence that she incurred medical expenses totaling $15,009.30, all of which she contends were caused and necessitated by the accident at issue. She contends that the jury's award for past medical expenses in the amount of $5,500.00 is manifestly erroneous in light of the documentary and medical evidence presented, as well as the jury's finding that she was disabled from working as a result of her injuries for a period of approximately seven months (implicit in the award for past lost wages, which has not been challenged on appeal by any party).
We agree with the defendants that the applicable standard of review of factual findings requires us to give great deference to the factfinder's conclusions and to refrain from reweighing the evidence or making credibility determinations. See Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). We also agree with the defendants' *128 contention that the weight given to the testimony of a treating physician must take into consideration the accuracy of the history provided the physician by the patient. See Magee v. Abek, Inc., 04-2554, p. 5 (La.App. 1st Cir.4/28/06), 934 So.2d 800, 807.
The medical evidence amply confirms the defendants' claim that the history provided to the treating physicians by Ms. Leighow was woefully inaccurate and incomplete. Indeed, our review of the record reveals that she had been involved in several prior accidents, and at least one subsequent accident. The record also reveals that Ms. Leighow had complained of the same or similar symptoms after those accidents as she reported suffering after this accident: dizziness, nausea and vomiting, blurred vision, and neck and back pain, all of which were not reported as part of her medical history to her treating physicians. Ms. Leighow further admitted at trial that she had filed claims and reached monetary settlements for the injuries sustained as a result of each of these other accidents. These facts bore upon Ms. Leighow's credibility and the accuracy of the medical causation opinions of her treating physicians.
The jury quite obviously accepted the defendants' position that the majority of Ms. Leighow's complaints and symptoms following the accident at issue either were not proven to have been caused by the accident at issue or were attributable to her customary "response style" to accidents, rather than to actual injury. Given that these findings were based upon credibility determinations and weighing of conflicting evidence by the jury, we cannot disturb them as long as the record provides a reasonable factual basis for them. While the record supports the finding that Ms. Crump's negligence legally caused Ms. Leighow some injuries, it also supports the jury's awarding less than the full amounts claimed for treatment of her claimed injuries.
Because there is a reasonable factual basis in the record to support the jury's credibility determinations and factual conclusions, the jury was not clearly wrong in choosing to award less than the full amount of medical expenses claimed to have been incurred as a direct result of the accident at issue.

GENERAL DAMAGES
However, for the following reasons, we find that the jury abused its discretion in failing to award any amount for Ms. Leighow's general damages after finding the injuries were, at least in some part, caused by Ms. Crump's negligence and after also finding that the injuries suffered by Ms. Leighow rendered her disabled from working following the incident, reflected by its award for past lost wages.
Louisiana jurisprudence has long held that where there is a factual finding that a plaintiff was injured and incurred medical expenses as a result of another's fault, the failure to award general damages is legal error, which requires the reviewing court to assess, de novo, the amount of general damages appropriate under the circumstances. Marcel v. Allstate Ins. Co., 536 So.2d 632, 635 (La.App. 1st Cir. 1988), writ denied, 539 So.2d 631 (La. 1989). However, in Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, our supreme court established an "abuse of discretion" standard of review for claimed inconsistency in damage awards, carving a narrow exception to the fact scenario underlying the jurisprudential general rule. In Wainwright, the supreme court held that "the particular facts of each case are ultimately determinative" as to whether awards for different elements of damages in personal injury cases are *129 inconsistent, and that "there is no bright line rule at work" in situations where special damages are awarded but no general damages are awarded. Wainwright, 00-0492 at pp. 8-9, 774 So.2d at 76. Thus, while it is still true that "a jury verdict awarding medical expenses but simultaneously denying damages for pain and suffering will most often be inconsistent in light of the record," it cannot be concluded that such a perceived inconsistency always amounts to legal error. Wainwright, 00-0492 at pp. 6-7, 774 So.2d at 75.
The Wainwright decision did not, however, go so far as to expressly abrogate the long-standing line of jurisprudence that it is legal error to award special damages for a personal injury, yet simultaneously refuse to award general damages for injuries with objective symptoms or findings. Instead, the court recognized a narrow exception to that general finding of inconsistency, applicable where the evidence supports a finding that a person incurred special damages (medical expenses) but did not necessarily experience compensable pain and suffering, because the medical treatment was precautionary or to simply evaluate whether or not physical injury occurred. Wainwright, 00-0492 at pp. 10-11, 774 So.2d at 77-78.
But the case before us is simply not the type of case contemplated in Wainwright, where special damages have been incurred without attendant physical pain and suffering. In a subsequent decision, Green v. K-Mart Corp., 03-2495, p. 8 (La.5/25/04), 874 So.2d 838, 844, the Supreme Court found the jury "abused its discretion" in failing to award general damages while awarding "a substantial amount for past and future medical expenses," distinguishing Wainwright. (Emphasis supplied.) The jury here specifically found that the plaintiff suffered injuries causally related to the accident, which required medical attention and resulted in some disability and resulting loss of earnings. Therefore, as in Green, the jury's failure to award general damages together with its award for special damages constitutes an abuse of discretion, warranting a de novo review of the record and the rendering of an appropriate award by this court.
Reading Wainwright and Green together, it is clear that the supreme court was consistent in applying an "abuse of discretion" standard of review under both factual scenarios, despite the differing results in those cases. In Green, the supreme court squarely held that "[f]ailing to make a general damage award was an abuse of discretion," rather than legal error. Green, 03-2495 at p. 8, 874 So.2d at 844. (Emphasis supplied.) Thus, if correction of the verdict is based upon finding an abuse of discretion, rather than manifest or "legal" error, our award must necessarily be limited to raising the inadequate general damages award to the lowest amount reasonably within the jury's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977). This is because "[i]t is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." Id. (Emphasis supplied.)[3]
*130 Considering the particular facts and circumstances of this case, the jury's factual findings implicit in the special damages awards, and the gamut of general damages awards for similar injuries, we find the appropriate award of general damages for Ms. Leighow's pain and suffering to be $3,500.00, the lowest amount reasonably within the jury's discretion and consistent with the special damages awards. Based upon our disposition of the merits, it is unnecessary for us to address Ms. Leighow's assignment of error as to the trial court's denial of her motion for JNOV.
For all the foregoing reasons, the judgment of the trial court is reversed in part and amended to include a general damage award for Ms. Leighow's past pain and suffering in the amount of $3,500.00, allocating the amount of that award to the intervenor, Kean's. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed to the defendants.
AFFIRMED IN PART AND REVERSED AND AMENDED IN PART.
WELCH, J., concurs in part and dissents in part.
WELCH, J., Concurring in Part and Dissenting in Part.
I respectfully concur in part and dissent in part from the majority opinion. I concur with the majority that the jury's failure to award general damages was legal error. However, I feel that the general damage award rendered by the majority is woefully inadequate based on the evidence in the record, notwithstanding the medical evidence of Ms. Leighow's prior accidents and symptomology, for all of the following reasons. I dissent from the majority's conclusion and application of the Coco standard in rendering the award for general damages. For reasons more detailed later herein, I believe the long-standing jurisprudential application of de novo review in the type of case before us remains unchanged after Wainwright, as reflected in the Supreme Court's subsequent opinion in Green.
The evidence conclusively establishes that as a result of hitting her head on the pavement during the incident in question, Ms. Leighow sustained a concussion, resulting in a vestibular disturbance condition, which caused her to suffer symptoms  benign positional vertigo, consisting of unrelenting and worsening dizziness, nausea and vomiting, which her treating physician, Dr. Fivgas, characterized as disabling. Once properly diagnosed, she received the repositioning treatment on the crystals in her ears which solved the problem, albeit seven to eight months later.
In stark contrast, the defendant's evidence of prior complaints of dizziness and nausea, following other incidents, reveals that after all of these incidents, the symptoms abated and resolved to the point where she returned to full function.[1] Moreover, none of these documented prior *131 complaints of dizziness resulted in the severe and disabling condition that resulted immediately following the incident at Kean's. Indeed, prior to the incident at issue, she was, and had been for approximately two year, symptom free and gainfully employed, with no complaints. The majority goes to great lengths to establish the plaintiff's involvement in other prior incidents; however, there is no legal basis to "penalize" a plaintiff simply because of the existence of prior accidents. Each case must be decided on the individual facts presented and legal causation must be proved by sufficient competent evidence. In this case, there is NO medical evidence that the very temporary dizziness and nausea occasionally exhibited by Ms. Leighow perhaps as a "reactionary response" to trauma in the past was anything more than that  a temporary response to trauma. None of these complaints necessitated more than the initial treatment, after which they resolved and no further treatment was sought by Ms. Leighow. In glaring contrast, the medical evidence conclusively reveals that the dizziness and nausea suffered by Ms. Leighow after her head hit the pavement at Kean's was actually a much worse condition that she had ever suffered before  vestibular disturbance, which the medical evidence establishes is wholly consistent with a blow to the head as suffered by Ms. Leighow in the Kean's incident. To the extent that the verdict reflects penalizing the plaintiff for prior wholly unrelated accidents, I find it is manifestly erroneous based on the evidence in this record. I also must note the incongruence in the jury's finding that the plaintiff was rendered disabled for at least seven and a half months as a result of this incident only, as reflected in its award for the full amount of her lost wages, with its failure to award damages for pain and suffering associated with this finding of disability.
Additionally, although the physicians who treated Ms. Leighow for her condition following this incident testified that they were not aware of all of the prior complaints of dizziness and nausea following other accidents, none of these physicians testified that this information would have changed their opinion that the vestibular dysfunction which she suffered immediately following the Kean's incident was consistent with the mechanism of injury and caused by her head hitting the pavement on December 5, 2000. Indeed, Dr. Soileau, a renowned expert in the diagnosis and treatment of vestibular dysfunction, testified that although Ms. Leighow did not tell him she suffered from dizziness prior to this incident, she did report to him that she had a previous head injury. However, based on the fact that "she complained about this immediately after [the Kean's incident], I mean, it's a pretty pure, plain thing. It's the most common reasons for this happening. . . . I don't know anything else that would have " (His testimony was then interrupted by defense counsel's next question.) Dr. Soileau later testified that given Ms. Leighow's results on the testing he performed, and the lack of certain findings "sort of precludes a major disturbance of vestibular dysfunction preceding that [the Kean's incident]."
Finally, in addition to my opinion that the evidence in the record established conclusively that the incident at Kean's caused Ms. Leighow to suffer from vestibular dysfunction, I also find that the established, uncontradicted facts warrant application of the jurisprudential legal presumption as set forth in Housley v. Cerise, 579 So.2d 973 (La.1991) that a medical condition producing disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, but shortly after the accident, the disabling condition manifested itself, providing *132 that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. Prior to this accident, Ms. Leighow was gainfully employed by Kean's without any restrictions or limitations. She also had no complaints and was exhibiting none of the symptoms, which were manifested immediately following the incident at Kean's and continued worsening thereafter. Indeed, the fact that upon finally getting the correct diagnosis and the proper treatment, Ms. Leighow's symptoms abated and the condition dramatically improved further supports that her condition was caused by the Kean's incident.
Therefore, the jury erred in failing to award general damages based on the evidence in the record regarding the symptoms related to Ms. Leighow's vestibular disturbance, as well as the effect it had on her life, from the date of the accident through January, 2002, when she was ultimately diagnosed and successfully treated by Dr. Soileau.
However, before reviewing the evidence and rendering an award, I must note my disagreement with the majority's application of the limiting Coco standard (awarding the lowest amount reasonably within the jury's discretion), rather than a de novo review. As noted by the majority, Louisiana jurisprudence has long held that where there is a factual finding that a plaintiff was injured and incurred medical expenses as a result of another's fault, the failure to award general damages is legal error, which requires this court to assess, de novo, the amount of general damages appropriate under the circumstances. However, the majority concludes that the Wainwright decision, which changed the standard of review of a jury's verdict failing to award general damages, to an abuse of discretion standard, also changed the standard by which to render an award from de novo to the limiting Coco standard. I disagree. The Coco standard applies, logically, when an award has been made by the jury, but the amount of that award is deemed to constitute an abuse of discretion. The standard is expressly stated as applying to an inadequate award that must be adjusted by the appellate court. Coco, 341 So.2d at 335. As noted by the majority, Wainwright was a very fact specific scenario and the exception created thereby was very narrow and limited to the scenario where special damages are awarded, general damages are not, and it is determined that no physical injury ever resulted. There is no indication, either express or implicit, in the Wainwright decision that the Supreme Court intended that the change in the standard of review in those very limited exceptional cases would be interpreted as abrogating the long-standing requirement that a de novo review be conducted by this court in the rendering of general damages when the jury has been found to have abused its discretion by failing to render such award. In fact, in the Supreme Court's subsequent case of Green, (also mentioned by the majority) the court found, as here, that the jury abused its discretion, and it affirmed the court of appeal's de novo review and rendering of damages, thus, implicitly confirming that the limited holding in Wainwright did not change the de novo standard applicable for the rendering of an award of general damages, when the jury abused its discretion in failing to render that award, but also awarded special damages. I agree with the majority that the Supreme Court consistently applied the "abuse of discretion" standard in both cases, but it did so only in relation to the jury's failure to render an award. The majority seems to ignore that after doing so, and finding an abuse of discretion, the *133 Green court explicitly affirmed the appellate court's de novo review:
Here, the court of appeal correctly determined that the jury abused its discretion in failing to award general damages while awarding a substantial amount for past and future medical expenses. . . .
The court of appeal conducted a de novo review of the record [to render an award for general damages]. . . . The court of appeal's decision to award general damages in the amount of $500,000 is affirmed.

Green, 03-2459, p. 8; 874 So.2d at 844.[2]
Therefore, my review of the evidence related to damages is de novo.
Both Ms. Leighow and her daughter who lived with her testified that almost immediately after returning home from the emergency room on the date of the incident, Ms. Leighow appeared dazed and confused and was overcome by nausea so bad that any slight movement of the head or eyes caused her to throw up. This continued and worsened daily to the point where she was either so nauseated she could not move, vomiting or dry heaving all throughout the day. The dizziness and vertigo prevented her from engaging in any activity; she could only sit still on a couch, without moving her head. She could not read or watch TV, as any movement of her eyes also exacerbated her symptoms. The dislodging of the crystals in her ear, in addition to preventing her from moving, caused her ear pain, discomfort, and a "roaring" in both ears. As time progressed, she also began suffering from blurred and double vision as well as jaw pain. Despite her numerous and consistent attempts to get the proper treatment, this did not happen until she saw Dr. Soileau, and her symptoms persisted on a daily basis for at least eight months; she and her daughter both testified they began to see improvement in August, 2001, when the repositioning treatments began.
The medical experts and Ms. Leighow's treating physicians consistently confirmed that vestibular disturbance caused by a closed head injury would cause the symptoms reported by Ms. Leighow, although due to the subjective nature of such injury, they were not always manifested upon physical examination. (As succinctly stated by Dr. Peters, when dealing with vertigo and labyrinthine, "you can't see these problems.") The evidence does confirm that she was unable to properly perform or complete certain diagnostic tests due to the dizziness and nausea, and she was noted to be gagging. There is no evidence to contradict the testimony of Ms. Leighow and her daughter regarding her symptoms and the effect they had on her life; indeed, the medical testimony confirmed that anyone suffering from any kind of vestibular disturbance is truly "miserable."
My review of jurisprudence of similar injuries reveals a very broad range of appropriate general damage awards for injuries related to post-concussion syndrome. The great variance in the awards seems to be based on factors such as the permanence of the condition and the extent of the symptoms. On the lower range, awards if $75,000 in general damages are found in cases where concussions resulted in headaches and dizziness for a temporary length of time. See e.g., Frazer v. St. *134 Tammany Parish School Bd., 99-2017 (La.App. 1st Cir.12/22/00), 774 So.2d 1227; Hoyt v. State Farm Mut. Auto. Ins. Co., 623 So.2d 651 (La.App. 1st Cir.), writ denied, 629 So.2d 1179 (La.1993). Notably different in the cases in the lower range of awards is the absence of a diagnosis of vestibular dysfunction and no mention of the disabling symptoms caused thereby of nausea, vomiting and dry heaving. At the higher range, between $200,000 and up to one and a half million dollars awarded in general damages, are cases where the vestibular dysfunction condition resulted from antibiotic toxicity rather than a head injury; and, in those cases, the condition is permanently disabling and not treatable. See e.g., Bolton v. Nagalla, 609 So.2d 1134 (La.App. 2nd Cir.1992), writ denied, 615 So.2d 338 (La.1993); Hall v. Brookshire Bros. Ltd., 2002-2404 (La.6/27/03), 848 So.2d 559. The mid-range of cases awarding general damages for similar injury include Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 1st Cir.), writ denied, 569 So.2d 965 (La.1990), where general damages in the amount of $150,000 were awarded for post concussion syndrome resulting in benign positional vertigo. In Whatley, although the plaintiff's symptoms of dizziness and vertigo occurred "only when she adjusts her head in certain positions," those positions were inconsistent and it was uncertain whether her condition was curable.
Although Ms. Leighow's condition was of limited duration and she was finally relieved of almost all of her symptoms after the repositioning treatments performed eight months later, her symptoms are otherwise most closely aligned with those experienced by the plaintiff in Levy v. Bayou Industrial Maintenance Services, Inc., XXXX-XXXX (La.App. 1st Cir.9/26/03), 855 So.2d 968, writs denied, XXXX-XXXX and XXXX-XXXX (La.2/6/04), 865 So.2d 724 and 727, where we affirmed a total general damage award of $225,000 in favor of a plaintiff who suffered from post concussion syndrome following a head injury. Ms. Levy's post concussion symptoms were very similar to Ms. Leighow's in that her main complaints centered around her constant dizziness, balance problems and headaches, ranging in severity from lightheadedness to vertigo. Although Ms. Levy suffered from blurring vision and an inability to maintain her balance, there is no mention in that case of the daily nausea and vomiting additionally experienced by Ms. Leighow. Most similarly, Ms. Levy, as did Ms. Leighow, was finally significantly improved after having repositioning treatments to the crystals in her ear, performed by the same Dr. Soileau, several months after the initial head injury. However, Levy's condition was still "partially permanent," and in addition to the repositioning treatments, Ms. Levy, unlike Ms. Leighow, necessitated surgery to repair a fistula.
Considering all of the foregoing, I find an appropriate award for Ms. Leighow's general damages suffered as a result of the incident at Kean's to be $100,000, and strongly disagree with the woefully inadequate award of $3,500 rendered by the majority.
NOTES
[1] Certain facts regarding the mechanics of the accident are disputed, such as whether the car door actually struck Ms. Leighow or whether it struck only Ms. Crump, who then landed on Ms. Leighow, causing them both to fall to the ground. The parties' testimony also differs on whether Ms. Leighow was dragged by the vehicle after she fell to the pavement. The parties dispute the extent of Ms. Leighow's physical injuries, such as visible cuts, abrasions, bruises, or bumps immediately following the accident. Finally, the parties dispute whether or not Ms. Leighow was rendered temporarily unconscious following the fall. But the parties do not dispute that Ms. Leighow was struck and fell to the ground. Inasmuch as the jury's verdict was based on factual findings, they required credibility determinations, which were made by the jury and are not to be reweighed or disturbed by this court, as the record contains reasonable evidence to support such findings. See Stobart v. State, through Dep't of Transp. And Dev., 617 So.2d 880, 882 (La.1993).
[2] Relative to fault and causation, the jury verdict read as follows:

Do you find that Kelly Crump was at fault in causing the accident/incident which is the subject matter of this lawsuit?
 YES X NO _____
2. If the answer to question number 1 was "Yes", do you find that the fault of Kelly Crump was the legal cause of any injuries/damages to Cherrie Leighow?
 YES X NO _____
3. Do you find that Cherrie Leighow was at fault in causing the incident. . . .
 YES _____ NO X 
. . . .
5. Please state the percentage of fault, if any, of the following for the accident which is the subject matter of this lawsuit:

Kelly Crump 100%
Cherrie Leighow 0%
Other person or entity 0%

[3] Under this analysis, it is still conceivable that in some cases, the failure to make an award of general damages might constitute manifest or "legal" error, if the inconsistency can somehow be determined to go beyond an abuse of discretion. In such cases, a de novo award, unlimited by the abuse of discretion standard, might be appropriate. It must be kept in mind, however, that de novo review of the record for the purpose of adjusting a general damages award under the Coco rule is different from a true de novo quantum award unencumbered by the Coco rule. At any rate, our disposition of the present case does not require us to attempt formulation of such an analysis.
[1] I also find it noteworthy that many of these medical records revealing that Ms. Leighow sought treatment for dizziness, depression, posttraumatic stress disorder, anxiety, and panic attacks were documented as being related to Ms. Leighow's son being tragically killed in a head-on collision in 1994. In corroboration thereof, Ms. Leighow testified that since that time, she had been treated for "nerves" and was put on antidepressant medication, which made her nauseated and caused occasional vomiting. However, the last documented treatment associated with this was almost two years prior to the accident, during which time there is no evidence of any recurring symptoms.
[2] To the extent that the majority opinion seems to distinguish Green on the basis that the jury in that case awarded future medical expenses, I find that to be a distinction without a difference, given that in Ms. Leighow's case, she admitted that her condition was resolved after the successful treatments with Dr. Soileou prior to trial, thus, she did not seek an award for future expenses. The abuse of discretion in both Wainwright and Green (and applicable in this case) is based on the jury's failure to award generals, while also awarding specials.